Donald J. HARMAN, Plaintiff-Appellant,

v.

LA CROSSE TRIBUNE, Robert R. Johns, Daniel T. Flaherty, Terry C. Gillette, Alan C. Cole, Robert D. Johns, Jr., Galen W. Pittman, Robert S. Gallagher, Gerard O'Flaherty and Kenneth O. Blanchard, Defendants-Respondents.†

Court of Appeals

*No. 82–2279. Submitted on briefs October 13, 1983.—*
*Decided January 18, 1984.*
(Also reported in 344 N.W.2d 536.)

† Petition to review denied.

For the plaintiff-appellant the cause was submitted on the brief of *Helen Zoellner Kelly* and *Donald J. Harman, Ltd.*, of La Crosse.

For the defendants-respondents Kenneth O. Blanchard, Robert S. Gallagher and the La Crosse Tribune, the cause was submitted on the brief of *Richard J. Delacenserie* and *Boardman, Suhr, Curry & Field* of Madison.

For the defendants-respondents Robert D. Johns, Daniel T. Flaherty, Terry C. Gillette, Alan C. Cole, Robert D. Johns, Jr., Galen W. Pittman and Gerard O'Flaherty, the cause was submitted on the brief of *Melissa Uelk Smith,* and *Bell, Metzner & Gierhart, S.C.* of Madison.

Before Gartzke, P.J., Dykman, J. and Gordon Myse, Reserve Judge.

DYKMAN, J.  Harman was a shareholder and employee of the firm of Johns, Flaherty, Harman and Gillette, S.C.  On March 25, 1975, the shareholders of Harman's law firm voted to terminate his employment. Harman brought an action against the shareholders and the La Crosse Tribune, its editor, and its publisher, claiming the Tribune had wrongfully interfered with his employment.  He also claimed the discharge violated his rights to free speech and to petition the government for a redress of grievances.  The trial court granted summary judgment for defendants.  We affirm.

Harman was also a member of the La Crosse County Board of Supervisors.  The Tribune was a longstanding client of Johns, Flaherty.

During the summer of 1974, the Tribune published a series of articles which criticized the county highway commissioner and members of the county highway department.  An article published July 17, 1974 stated that $3,600 worth of gravel purchased for use on a county highway project was not used there.  A companion article implied that the county highway commissioner had expropriated the missing gravel for his private road.  The Tribune consulted with a senior shareholder of Johns, Flaherty before it published these articles.

The articles' allegations were based on a report by an engineering firm that had taken drill corings from the road.  The report contained a disclaimer, however, which

stated that the firm did not warrant conditions below the depth of the corings or that the strata logged were typical of the entire site. After reading the report and disclaimer, Harman concluded that the report could not be used to determine how much gravel had been used on the highway project and that it therefore did not support the Tribune's allegations.

On March 24, 1975, Harman issued a press release stating that the Tribune's editor and two reporters had deliberately furnished false information to a newspaper for publication. The press release stated that the editor and reporters had violated sec. 942.03, Stats. (1973), and urged that they be prosecuted.[1] On March 25, the other shareholders of Johns, Flaherty voted to discharge Harman. Additional facts will be stated in the opinion.

Section 802.08(2), Stats., provides that summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When reviewing a trial court's grant of summary judgment, we apply the same analysis as the trial court. *Heinz Plastic Mold v. Continental Tool,* 114 Wis. 2d 54, 57, 337 N.W.2d 189, 191 (Ct. App. 1983). The analysis is as follows:

[T]he court . . . first examines the pleadings to determine whether claims have been stated and a material factual issue is presented. If the complaint . . . states a

---

[1] Section 942.03, Stats. (1973), provides:

Whoever, with intent that it be published and that it injure any person, and with knowledge that it is false, communicates to a newspaper, magazine, or other publication any false statement concerning any person or any false and unauthorized advertisement may be fined not more than $200 or imprisoned not more than 6 months or both.

claim and the pleadings show the existence of factual issues, the court examines the moving party's affidavits for evidentiary facts admissible in evidence or other proof to determine whether that party has made a prima facie case for summary judgment. To make a prima facie case for summary judgment, a moving defendant must show a defense which would defeat the claim. If the moving party has made a prima facie case for summary judgment, the court examines the affidavits submitted by the opposing party for evidentiary facts and other proof to determine whether a genuine issue exists as to any material fact, or reasonable conflicting inferences may be drawn from the undisputed facts, and therefore a trial is necessary.

*In re Cherokee Park Plat,* 113 Wis. 2d 112, 116, 334 N.W.2d 580, 582–83 (Ct. App. 1983).

## FIRST AMENDMENT CLAIM

The first amendment to the United States Constitution limits the actions of federal and state governments.[2] It provides no protection against action by private persons. *Hudgens v. NLRB,* 424 U.S. 507, 513 (1976). In *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 573, 335 N.W.2d 834, 840 (1983), however, the supreme court held that an employee may bring a claim for wrongful discharge against a private employer when the discharge was contrary to a "fundamental and well-defined public policy" as expressed by constitutional and statutory provisions.

---

[2] The first amendment to the United States Constitution provides in part:

Congress shall make no law . . . abridging the freedom of speech . . . .

The claim outlined in *Brockmeyer* is very narrow.[3] The court said: "A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. . . . An employee cannot be fired for refusing to violate the constitution or a statute. Employers will be held liable for those terminations that effectuate an unlawful end." *Id.* Assuming without holding that this rule also covers an employee who is terminated for exercising a right protected by constitution or statute, as well as an employee who is terminated for refusing to violate a constitution or statute, we conclude that Harman's discharge did not violate public policy.

The Code of Professional Responsibility, SCR 20.01 to 20.51, restricts attorneys' right of free speech when the speech would adversely affect their clients.[4] SCR 20.35 (1), a disciplinary rule, provides in part: "A lawyer may not intentionally: . . . (c) Prejudice or damage the client during the course of the professional relationship, except as required under SCR 20.36(2)." The title to SCR 20.34, also part of the rules,[5] states: "A lawyer should represent a client zealously within the bounds of the law." SCR 20.34(2), an ethical consideration, provides in part:

---

[3] The narrowness of the public policy exception to the at-will rule adopted by many courts is discussed and criticized in Note, *Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception*, 96 Harvard L. Rev 1931 (1983).

[4] Harman does not argue that the limitations placed on his free speech rights by the Code of Professional Responsibility are invalid under the first and fourteenth amendments to the United States Constitution. We therefore do not address that issue.

[5] SCR 20.51 provides in part:

(2) The titles to SCR 20.02, 20.06, 20.17, 20.21, 20.23, 20.31, 20.34, 20.45 and 20.48 are part of the rules.

(3) The following rules are, and may be cited as, disciplinary rules: SCR 20.01, 20.03 to 20.05, 20.07 to 20.16, 20.18 to 20.20, 20.22, 20.24 to 20.30, 20.32, 20.33, 20.35 to 20.44, 20.46, 20.47, 20.49 and 20.50.

(f) In the exercise of his or her professional judgment on those decisions which are for his or her determination in the handling of a legal matter, a lawyer should always act in a manner consistent with the best interests of his or her client. . . .

. . . .

(n) . . . . [A] lawyer must act always with circumspection in order that his or her conduct will not adversely affect the rights of a client in a matter he or she is then handling . . . .

These rules and ethical considerations establish that an attorney has a duty of loyalty to his or her client—*i.e.*, a duty to act in the client's best interests during the course of the representation. Breach of this duty constitutes professional misconduct, SCR 20.04, and may result in discipline.

The duty of loyalty runs from each attorney employed by a law firm to every client of that firm. Harman breached his duty of loyalty to the Tribune when he publicly accused its editor and two reporters of criminal behavior in a matter on which the firm had advised the Tribune, and called for their prosecution. His discharge under this circumstance does not "clearly contravene the public welfare" or "gravely violate paramount requirements of public interest." *Brockmeyer*, 113 Wis. 2d at 573, 335 N.W.2d at 840. The supreme court determined, by adopting the Code of Professional Responsibility that the public interest will be served if attorneys maintain a high standard of loyalty toward their clients.

Harman argues that where one party's business interests collide with another party's first amendment rights, the first amendment rights must prevail. The law firm's affidavits show, however, that the shareholders were not merely protecting the firm against the loss of a client. They were also attempting to ensure that the firm would

meet its professional obligations to its client by discharging the member who had caused the firm to breach its duty of loyalty to that client. The trial court's grant of summary judgment on the first amendment claim is affirmed.

## INTERFERENCE WITH EMPLOYMENT RELATIONSHIP

*Law Firm Members*

One who, without a privilege to do so, induces a third person not to perform a contract with another is liable for the harm caused thereby. *Liebe v. City Finance Company*, 98 Wis. 2d 10, 15–16, 295 N.W.2d 16, 19 (Ct. App. 1980). A claim exists for unlawful interference with a contract terminable at will. *Charolais Breeding Ranches v. FPC Securities*, 90 Wis. 2d 97, 104, 279 N.W.2d 493, 496 (Ct. App. 1979). Directors of a corporation who authorize a breach of contract between the corporation and a third person are protected by only a conditional privilege, which will be destroyed by a wrongful motive. *Lorenz v. Dreske*, 62 Wis. 2d 273, 287, 214 N.W.2d 753, 760 (1974). If they are acting in good faith for the protection of the interests of their corporation and in the course of their official duty, they will sustain no liability for the breach. *Id.*

The shareholders state in their affidavits that they voted to terminate Harman's employment because Harman had placed the firm in a position of conflict of interest with the Tribune and because they wanted to maintain the law firm's reputation for effective representation of clients. This constitutes action in good faith for the protection of the interests of the corporation. It

therefore falls within the privilege described in *Lorenz* and establishes a defense constituting a *prima facie* case for summary judgment.

We next examine Harman's affidavits to determine whether he has raised a genuine issue of material fact or whether reasonable conflicting inferences can be drawn from the undisputed facts. *Cherokee Park Plat, supra.* Specifically, we must determine whether the material Harman presents raises a reasonable inference that the shareholders did not act in good faith to protect the interests of their corporation when they voted to discharge Harman.

Harman argues that the undisputed facts give rise to reasonable inferences that (1) the shareholders discharged him to protect themselves and the Tribune from possible civil or criminal action; (2) the shareholders were acting in bad faith when they discharged him; and (3) they discharged him in retaliation for exposing the falsity of the Tribune's stories. He draws these inferences from the following facts: (1) Harman brought to the public's attention the false information contained in the Tribune's articles; (2) the shareholders produced no evidence that the July 17 story was accurate; (3) the shareholders discharged him almost immediately after he issued the press release; and (4) he consulted with several shareholders before he issued the release, but none of them told him not to do it and none advised him that a conflict of interest would arise.

The facts Harmon relies upon do not reasonably support the inferences he draws. With respect to the first inference, Harman does not explain how discharging him would discourage third parties from bringing criminal or civil charges against a shareholder or the Tribune. With respect to the second inference, bad faith is not established by the shareholders' failure to advise Harman or

by the immediacy of the discharge. Harman was responsible for his own compliance with ethical standards. Speedy termination following a breach of those standards was a proper response and does not establish bad faith. With respect to the third inference, Harman does not explain what interest the shareholders might have in whether the Tribune's stories were shown to be inaccurate.

Resolving the question whether the shareholders acted in good faith in voting to discharge Harman requires a determination of the intent behind their votes. As a general rule, a person's intent cannot be determined on a motion for summary judgment. *Lecus v. American Mut. Ins. Co. of Boston,* 81 Wis. 2d 183, 190, 260 N.W.2d 241, 244 (1977). In this case, however, Harman has presented no factual material from which a reasonable jury could infer that the shareholders lacked good faith. Harman has not established that there exists a genuine issue as to any material fact. Sec. 802.08(2), Stats. The trial court's grant of summary judgment for the shareholders on the interference claim is affirmed.

*Tribune*

Harman argues that the undisputed facts give rise to an inference that Gallagher, the Tribune's editor, and Blanchard, the publisher, induced the firm to discharge him. He draws this inference from the following facts: (1) Harman publicly challenged the Tribune's credibility; (2) Gallagher asked Flaherty if Flaherty could represent him if he were prosecuted; (3) Flaherty's notes of the events of March 23 and 24 indicated it would be "very embarrassing and damaging to firm" if Harman issued the press release and refer to the release as "[Gallagher's] problem and ours;" (4) Flaherty's notes

state he planned to "try to resolve the problem this noon" and telephone Gallagher afterward; (5) Flaherty and Gillette went to the Tribune to apologize to Blanchard and Gallagher; (6) when Harman told Gillette that Gallagher denied any involvement in his discharge, Gillette said, "It was Blanchard;" (7) Gallagher told Harman that the Tribune would "have to get a new law firm"; (8) Gallagher told a Tribune reporter that Harman created a conflict of interest between the Tribune and the law firm; (9) the Tribune did not report that the law firm gave Harman permission to serve on the county board of supervisors.

Gillette's statement, "It was Blanchard," and Gallagher's statement that the Tribune would "have to get a new law firm" raise an inference that Blanchard and Gallagher told the firm that the Tribune would fire the law firm if the law firm did not fire Harman. This constitutes interference with Harman's employment with the firm.

■

We conclude, however, that any such interference was not wrongful. Harman breached his duty of loyalty to the Tribune. He testified at his deposition that he was willing to be the complainant if criminal charges were brought against Gallagher or the reporters. This would have severely limited, if not precluded, the law firm's defense of Gallagher and the reporters as long as Harman remained a member of the firm. SCR 20.23 and 20.24.[6] It was not improper under these circumstances

---

[6] SCR 20.41(1), a disciplinary rule, provides:

Except with the consent of the client after full disclosure, a lawyer may not accept employment if the exercise of his or her professional judgment on behalf of the client will be or reasonably may be affected by his or her own financial, business, property or personal interests.

for Gallagher or Blanchard to tell Johns, Flaherty that the Tribune would retain new counsel if Harman remained employed with the firm. The trial court's grant of summary judgment for Gallagher, Blanchard and the Tribune is affirmed.

*By the Court.*—Judgment affirmed.

SCR 20.23, an ethical consideration, provides in part:

*A lawyer should exercise independent professional judgment on behalf of a client.* (1) The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising influences and loyalties. Neither his or her personal interests, the interests of other clients, nor the desires of 3rd parties should be permitted *to dilute a lawyer's loyalty to a client.*

(2) (a) A lawyer should not accept proffered employment if his or her personal interests or desires will, or there is a reasonable probability that they will, affect adversely the advice to be given or services rendered the prospective client. After accepting employment, a lawyer carefully should refrain from acquiring a property right or assuming a position that would tend to make his or her judgment less protective of the interests of a client.