Virgil F. GUSTAFSON and Margaret F. Gustafson,
Plaintiffs-Respondents,

v.

PHYSICIANS INSURANCE COMPANY OF WISCONSIN, Inc., a
Wisconsin corporation, Peter A. Beatty, M.D., Martin
A. Rammer, M.D., and Wisconsin Patients Compensa-
tion Fund, Defendants-Respondents,

MIDWESTERN NATIONAL INSURANCE CORPORATION, n/k/a
Midwest Security Life Insurance Company, a Wiscon-
sin corporation, Defendant-Appellant.

Court of Appeals

*No. 97–3832. Submitted on briefs September 25,
1998.—Decided November 18, 1998.*

(Also reported in 588 N.W.2d 363.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael E. Engel* and *Elizabeth Kiefer* of *Midwest Security Insurance Company* of Onalaska.

On behalf of the plaintifs-respondents and the defendants-respondents, the cause was submitted on the briefs of *Dean M. Horwitz* and *Hope K. Olson* of

*Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.* of Milwaukee and *Mary Lee Ratzel* and *Molly C. Feldbruegge* of *Peterson, Johnson & Murray, S.C.* of Milwaukee, respectively.

Before Brown, Nettesheim and Anderson, JJ.

ANDERSON, J.   Midwestern National Insurance Corporation (MNIC), the plaintiffs'—the Gustafsons—subrogated insurer, appeals from a judgment granting the prevailing defendants, Physicians Insurance Company of Wisconsin, Inc. and others (PIC), their costs for defending the lawsuit and an order denying reconsideration of this issue. MNIC contends that this is an inequitable result. It asserts that it had a representation agreement in effect with the Gustafsons' counsel, Dean Horwitz, when he negotiated the settlement agreement with PIC. After losing at trial, the Gustafsons settled with PIC: they agreed not to appeal the case if PIC would not tax costs against them. The settlement agreement included, however, the right for PIC to still pursue costs against MNIC. MNIC argues that during the settlement negotiations Horwitz disregarded his duty to MNIC and instead negotiated a more favorable deal for the Gustafsons. We agree. Because the settlement was unfair to MNIC, it would be unjust to allow PIC to tax costs against it. Accordingly, we reverse.

### BACKGROUND

After being diagnosed and treated for cancer when he was actually suffering from an infection caused by an abscessed tooth, Virgil F. Gustafson, who was joined by his wife, Margaret, filed a medical malpractice claim against his doctors—Peter A. Beatty, M.D. and Martin

A. Rammer, M.D.—and the doctors' malpractice insurance carriers—Physicians Insurance Company and Wisconsin Patients Compensation Fund. Because it provided Gustafson's health insurance and had paid his medical expenses, MNIC was joined in the lawsuit as a subrogated party pursuant to § 803.03(2), STATS.[1]

During the preliminary stages of the lawsuit, MNIC was represented by its own counsel, Lee Fehr. It is uncontested that on March 1, 1996, Fehr telephoned Horwitz and left a recorded message for him. Horwitz memorialized his understanding of Fehr's telephone message in a letter to Fehr dated March 5, 1996. In this letter Horwitz stated:

> If this case is settled out of court, Midwestern National will agree to accept $16,000.00 in lieu of whatever lien it may have in this case. . . .
>
> On the other hand, should this case go to trial, Midwestern National agrees to pay this law firm a 33 1/3 percent fee on any past medical expenses which are awarded to Mr. Gustafson. If I have misstated any portion of our agreement, please contact me.

MNIC did not respond to Horwitz' letter; in fact, there were no further communications between MNIC and Horwitz until after the trial.

MNIC's counsel did not participate in the trial. On June 18, 1997, the jury delivered a verdict in favor of the defendants. Soon thereafter, Gustafson and PIC negotiated a settlement agreement. In this agreement,

---

[1] Although MNIC was originally named as a defendant, § 803.03, STATS., intends for an insurer with a subrogated claim to be joined as a party plaintiff. See Sampson v. Logue, 184 Wis. 2d 20, 28, 515 N.W.2d 917, 920 (Ct. App. 1994). Therefore, MNIC should have been joined as a plaintiff. See id.

Gustafson agreed not to appeal the judgment if PIC would waive the right to tax costs against him.

Horwitz alleges that a conversation occurred between Fehr and him on June 24, 1997, in which he notified Fehr of the jury's verdict. The parties dispute whether this conversation did indeed occur. Evidence was presented that on July 3, 1997, Horwitz sent MNIC a letter to update it about the case. The July 3 letter to MNIC's new counsel read:

> This will confirm my telephone conversation with your predecessor, Lee Fehr on June 24, 1997. On June 18, 1997 a Sheboygan County Circuit Court jury found on behalf of the defendants in this case. At the time I spoke with Mr. Fehr I informed him that we were very strongly leaning toward dismissing all claims against the defendants in return for a waiver of taxable costs because there were no appellate issues. Mr. and Mrs. Gustafson have now decided to dismiss any and all claims against the defendants in return for a waiver of taxable costs. The defense has agreed to waive taxable costs against Mr. and Mrs. Gustafson. Accordingly, the Gustafsons will not be bringing any motions after the verdict on their own behalf.
>
> Should you have any questions, please do not hesitate to contact me.

Horwitz also maintains that during the June 24 telephone conversation with Fehr, he advised Fehr that opposing counsel made a comment during trial indicating that PIC would seek taxable costs against MNIC. Again, this fact is disputed.

On July 17, 1997, PIC submitted a proposed order for the defendants' taxable costs and attorney's fees. MNIC asserts that this was the first notice it had of PIC reserving the right to tax costs against it. The next

day MNIC objected to the order and requested a thirty-day briefing period and a hearing on the issue. The court granted these requests and scheduled a hearing for October 6, 1997.

Meanwhile, a dispute developed between Horwitz and MNIC over whether the March 5 letter solidified an attorney-client agreement for Horwitz to represent MNIC's interests in this case. For example, on August 19, 1997, Horwitz wrote to the trial court that:

> At no time did th[is] law firm. . .ever agree to represent Midwestern National Insurance Corporation at trial or otherwise. My letter to Attorney Fehr of March 5, 1996 is clear on its face and speaks for itself. As a courtesy to Attorney Fehr and Midwestern National, our law firm agreed to prove up Mr. Gustafson's medical expenses at trial. . . . If the plaintiffs had been successful at trial, Midwestern National would have been the beneficiaries of our law firm's work, and therefore we felt entitled to some compensation.

In opposition of the motion to tax costs, MNIC argued to the court that pursuant to § 803.03(2)(b), STATS., it, being a subrogated party, opted to allow Horwitz to represent its interests in the case. It further asserted that Horwitz agreed to represent MNIC in his March 5 letter. Additionally, it argued that it did not have a claim against PIC in the first place; rather, according to the insurance policy, in MNIC's role as a subrogated party, the "only possible claim Midwest could have in this case is for reimbursement from the plaintiffs after they were successful in settlement or trial." Therefore, since MNIC could not pursue a claim against PIC, it asserts that it also could not be a losing party. Accordingly, if MNIC was not a losing party, costs could not be taxed against it.

After the October 6 hearing, the trial court granted the order for judgment for costs against MNIC. The court reasoned that MNIC had not met its burden of showing that Horwitz would be representing it in this matter. It found persuasive the fact that the court lacked proper notice of the representation required by § 803.03(2)(b), STATS. According to the statute, MNIC should have signed a "written waiver of the right to participate [in the trial] which shall express consent to be bound by the judgment in the action." *Id.* Moreover, the court relied on *Sampson v. Logue*, 184 Wis. 2d 20, 515 N.W.2d 917 (Ct. App. 1994), to find that PIC was entitled to tax costs against a subrogated party.

On October 28, 1997, PIC notified the court of a recently released decision, *Fakler v. Nathan*, 214 Wis. 2d 458, 571 N.W.2d 465 (Ct. App. 1997), that had remarkably similar facts. PIC stated that it wanted to bring this case to the court's attention because "it disallows costs to be paid to a defendant by a subrogated party when the defendant waives its right to collect costs from the plaintiff." On October 31, 1997, MNIC filed a motion to reconsider the order allowing the taxation of costs. It argued that "[l]ike in *Fakler* it would be inequitable to tax costs in a situation where plaintiffs and defendants make a deal regarding costs at a point in the litigation when Midwest had no real opportunity to protect its interests."

Despite MNIC's *Fakler* arguments, the trial court denied the motion to reconsider. Again, the court found that MNIC did not have an attorney-client representation agreement with Horwitz, but rather "some agreement to pay monies." It further held that the notice requirement of § 803.03(2)(b), STATS., was not absolutely necessary. However, it found that the ineq-

uities in *Fakler* were not present in this case. MNIC appeals.

## DISCUSSION

The issue in this appeal is whether a defendant, after waiving its right to tax costs against the losing plaintiff, may then pursue its costs against the subrogated party, who did not take part in the plaintiff's settlement agreement despite being represented at that time by the same counsel. Before deciding this ultimate issue, we must first examine the communications and actions between Horwitz and MNIC to ascertain whether these acts satisfy the requirements for an attorney-client contract. Next, we consider the scope or range of the contractual agreement and its possible termination. Lastly, we discuss MNIC's failure to give proper notice to the court of its intent to be represented by Horwitz pursuant to § 803.03(2)(b), STATS.

## I. THE CONTRACT

### *Existence of a Contract*

We first consider whether there was a contract for legal services between Horwitz and MNIC. MNIC contends that Horwitz agreed to represent its interests at trial. Additionally, it argues that the trial court erred by finding that no attorney-client representation agreement existed but, on the contrary, only "some agreement to pay monies." We agree with MNIC's contention that an attorney-client contract was formed.

Both parties agree that on March 1 Fehr left a telephone message for Horwitz and that Horwitz responded to Fehr's message in a March 5 letter. When

172

the facts are undisputed, the existence and interpretation of a contract are questions of law that we review de novo. *See Schlosser v. Allis-Chalmers Corp.*, 86 Wis. 2d 226, 244, 271 N.W.2d 879, 887 (1978).

According to hornbook law, a contract consists of an offer, an acceptance and consideration. *See NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 837, 520 N.W.2d 93, 96 (Ct. App. 1994). An offer and acceptance exist when mutual expressions of assent are present. *See id.* Consideration exists if an intent to be bound to the contract is evident. *See id.*

> In general, the relationship of attorney and client is one of agency resting upon contract, and the rules governing contract formation determine whether such a relationship has been created. The contract may be express, yet formality is not essential. Since representation is often informal, the relationship may be implied from the words and actions of the parties.
>
> . . . .
>
> [T]he court stated in reference to establishing an attorney-client relationship that "*the contractual intent and conduct of the parties are critical to the formation of such relationship.*"

*Security Bank v. Klicker*, 142 Wis. 2d 289, 295, 298, 418 N.W.2d 27, 30, 32 (Ct. App. 1987) (emphasis added; quoted source omitted).

Upon examination of the parties' initial communications, it is evident that all of the terms of a contract are not contained in Horwitz' March 5 letter. However, Fehr's March 1 telephone message initiating the agreement may also be considered. We hold that the elements of offer, acceptance and consideration are evi-

173

denced by Fehr's telephone message and Horwitz' letter. MNIC maintains that it had a representation agreement with Horwitz. At all times prior to Fehr's message, MNIC handled all aspects of the case. According to MNIC, it did not appear at the trial because it believed Horwitz was representing its interests. We conclude that an offer to represent MNIC in the case was made to Horwitz in the telephone message. We further conclude that Horwitz accepted this offer and its proposed consideration in his letter to Fehr. Horwitz argues that he only agreed to prove up MNIC's interests at trial in return for compensation. This argument is not convincing; on the contrary, it demonstrates that MNIC made Horwitz an offer, and Horwitz accepted the offer in exchange for consideration. We hold that this evidence of the contractual intent and conduct of the parties shows that Horwitz agreed to represent MNIC at trial. This arrangement satisfies the criteria for an attorney-client contract.

*Scope of Contract*

Having concluded that an attorney-client contract existed between the parties, we next examine the scope of this contract for services. MNIC argues that it expected Horwitz to represent its interests, which would include trial, motions after the verdict, and entry of the judgment. As previously mentioned, Horwitz argues that he only agreed to "prove up Mr. Gustafson's medical expenses at trial, which we would have had to do in any event." Thus, his contention is that he was only bound to represent Gustafson, not MNIC, in the postdecision settlement he negotiated with PIC. On the contrary, we conclude that Horwitz' fiduciary duty as MNIC's attorney continued after trial

174

and included representing MNIC in the postsettlement discussions.

> [I]t is generally understood that an attorney of record in an action retains his duty and authority as such for some period of time . . . after judgment. . . . [W]hen a party retains an attorney to appear in an action, the party contemplates the usual and ordinary proceedings which may be taken after judgment . . . .

*Hooker v. Hooker*, 8 Wis. 2d 331, 336–37, 99 N.W.2d 113, 116–17 (1959). Horwitz had a general authority and duty to protect MNIC's interests once he agreed to undertake its representation. This duty continues until the attorney-client relationship is discharged. *See id.*

■

In *Illinois Steel Co. v. Warras*, 141 Wis. 119, 123 N.W. 656 (1909), a defendant sought to be relieved from the effects of a stipulation on the grounds that it was beyond the scope of the attorney's powers to enter into the stipulation in the first place. *See id.* at 121–22, 123 N.W. at 657. The trial court's decision to set aside the stipulation was reversed. *See id.* at 126, 123 N.W. at 659. The supreme court explained the attorney's duty in the case as follows:

> The powers of attorneys at law in charge of litigation are very broad, and while it may be that the general retainer is not sufficient to authorize an absolute surrender of substantive property rights which the attorney is employed to establish and enforce, still it is and must be sufficient to enable the attorney in his honest judgment to control all matter of procedure in the action brought for such enforcement.

*Id.* at 122, 123 N.W. at 657 (citations omitted). Analogously in this case, Horwitz was under a contract to represent MNIC in this litigation. He was given authority to represent MNIC's subrogation interest and as its representative was required to complete all actions.

## II. TERMINATION OF ATTORNEY-CLIENT RELATIONSHIP

Section 879.17, STATS., requires that "[t]he attorney who first appears for any party . . . shall be recognized as the attorney throughout the matter or proceeding." An attorney must represent the client in the matter to its ultimate conclusion, including any postjudgment activities. *See Hooker*, 8 Wis. 2d at 336–37, 99 N.W.2d at 116–17. The circumstances under which an attorney may withdraw from representing a client are defined in SCR 20:1.16.[2] If an

---

[2] This provides as follows:

**SCR 20:1.16 Declining or terminating representation.**

(b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if:

(1) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;

(2) the client has used the lawyer's services to perpetrate a crime or fraud;

(3) a client insists upon pursuing an objective that the lawyer considers repugnant or imprudent;

(4) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;

(5) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or

attorney does decide to withdraw from the representation, it is mandated that the attorney still take every practicable step to protect the client's interests. *See* SCR 20:1.16(d).

Moreover, an attorney has a duty of loyalty to his or her client. *See Harman v. La Crosse Tribune,* 117 Wis. 2d 448, 454, 344 N.W.2d 536, 540 (Ct. App. 1984). Part of this duty includes acting in the client's best interests during the course of the representation. *See id.* Failure to adequately perform this duty constitutes professional misconduct and may result in discipline. *See id.; see also* SCR 20:8.4.

In this case, Horwitz engaged in settlement discussions with PIC after PIC was victorious at trial. At the time of these discussions, Horwitz had a duty to represent both Gustafson and MNIC. An attorney must "inform a client of all offers of settlement and abide by a client's decision whether to accept an offer of settlement." SCR 20:1.2. MNIC was not consulted about the settlement offer. Instead, Horwitz sent the July 3 letter informing MNIC of the trial's outcome and of the settlement agreed to by Gustafson and PIC.

Horwitz was ethically bound to represent both Gustafson and MNIC in the settlement negotiations. The agreement that was reached—PIC's waiver of the right to tax costs against Gustafson if Gustafson similarly waived his right to appeal—did not represent MNIC's interests at all. On the contrary, it appears that Horwitz negotiated a settlement that benefited one client at the expense of the other. An attorney is mandated to never "represent a client if the representation of that client will be directly adverse to another

---

(6)   other good cause for withdrawal exists.

client." SCR 20:1.7. Breach of this duty constitutes misconduct and risks discipline. *See* SCR 20:8.4.

If Horwitz did not want to represent MNIC after the verdict, he had a duty to inform MNIC and also to protect its interests until the court approved his withdrawal. *See* SCR 20:1.16(d). Until he had a court-approved withdrawal from representation, Horwitz had an ethical duty of loyalty to MNIC. *See generally Harman*, 117 Wis. 2d at 454, 344 N.W.2d at 540.

## III. TAXATION OF COSTS AGAINST MNIC

Because PIC was successful at trial, it is entitled to recover its costs in defending the action. *See* § 814.03, STATS. PIC could recover costs against both Gustafson and MNIC, the subrogated insurer. *See Sampson,* 184 Wis. 2d at 29, 515 N.W.2d at 921. We will now address MNIC's contention that allowing PIC to tax costs against it creates an inequitable result.

In a factually similar case, we held that a defendant could not tax costs against the subrogated party. *See Fakler*, 214 Wis. 2d at 466, 571 N.W.2d at 469. In that case, the subrogated party also opted to have its interests represented by the plaintiffs' counsel at trial. *See id.* at 461, 571 N.W.2d at 467. After a verdict in favor of the defendants, the plaintiffs filed a motion after the verdict for a new trial, and the defendants sought costs against both the plaintiffs and the subrogated insurer. *See id.* at 460, 571 N.W.2d at 467. Like the present case, the *Fakler* defendants negotiated a settlement agreement with the plaintiffs without the subrogated party's participation. *See id.* The settlement agreement they reached is remarkably similar to the one at issue here. The defendants agreed not to seek costs from the plaintiffs, and the plaintiffs agreed to withdraw their motion after verdict. *See id.* Here,

the present case differs only in that Gustafson waived his postjudgment options before any had been utilized.

The trial court in *Fakler* noted that the "crafty lawyering" involved in the settlement agreement resulted in an "inequity to the subrogated plaintiff who participated in the litigation under the condition that its interest will be represented by the insured." *Id.* We determined that:

> [I]t may seem unfair to disallow the Defendants to recover costs from [the subrogated party], because doing so prevents them from recovering any costs at all. On balance, however, we conclude that given the circumstances of this case, it would be inequitable to allow the Defendants to recover any costs from [the subrogated party] because doing so: (1) would be drastically unfair to [the subrogated party]; and (2) would award an undeserved windfall to the Defendants.
>
> . . . .
>
> Because the Faklers represented [the subrogated party's] interest at trial, they may have been awarded reasonable attorney fees if they had been successful. It would be inequitable to allow the Faklers, in a successful outcome, to obtain attorney fees for representing [the subrogated party's] interest, while permitting the Faklers, in an unsuccessful outcome, to place all of the liability for costs on [the subrogated party] by bargaining away [the subrogated party's] interest.

*Id.* at 463, 465–66, 571 N.W.2d at 467, 469 (citation omitted).

We agree that, like *Fakler*, allowing PIC to tax costs against MNIC "would be drastically unfair." *Id.* at 463, 571 N.W.2d at 467. Although unlike *Fakler*'s subrogated party, MNIC had notice of the settlement from

Horwitz' July 3 letter, and it still had an opportunity to address the trial court on the costs issue; however, we cannot ignore the fact that in this case, too, "crafty lawyering" was at play in the settlement negotiations. As we have previously detailed, we find compelling the fact that despite his ethical obligations, Horwitz negotiated for one client at the expense of the other. Under these facts and circumstances, the scales have been tipped against MNIC.

## IV. REQUIREMENTS OF § 803.03(2)(b), STATS.

Because MNIC was Gustafson's health insurance provider, it was joined as a party according to § 803.03, STATS. Section 803.03(2) provides for the joinder of subrogation claims as follows:

> (a)  *Joinder of related claims.* A party asserting a claim for affirmative relief shall join as parties to the action all persons who at the commencement of the action have claims based upon subrogation to the rights of the party asserting the principal claim
> . . . .
> (b)  *Options after joinder.* Any party joined . . . may 1. participate in the prosecution of the action, 2. agree to have his or her interest represented by the party who caused the joinder, or 3. move for dismissal with or without prejudice. If the party joined chooses to have his or her interest represented by the party who caused the joinder, the party joined *shall sign a written waiver of the right to participate which shall express consent to be bound by the judgment in the action.* [Emphasis added.]

We have held that in accordance with § 803.03(2)(b)2, STATS., MNIC requested that Horwitz, the joining party's counsel, represent its interests. In

180

opposition of MNIC's contention that it had an attorney-client relationship with Horwitz, PIC emphasizes that MNIC did not file the written waiver of its intent to be represented by Horwitz with the court as required in § 803.03(2)(b).

In *Fakler*, we also addressed this issue. *See Fakler*, 214 Wis. 2d at 464 n.2, 571 N.W.2d at 468. There, we examined the record and found that although the party failed to file the written waiver, a marked change in the protection of its interests had occurred. *See id.* This marked change could only lead us to the conclusion that a representation agreement with the joining party's counsel had been reached. For example, the party was at first substantially involved in the proceedings before trial, and then it did not actively participate in the trial. *See id.* From these facts, we concluded that the party had not abandoned its interests and that the written waiver is a technical requirement that should not be detrimental to a finding that the party's interests were represented by the joining party's counsel.

In this instance, we conclude that MNIC's failure to file the written waiver with the court should also not be fatal to our determination that an agreement for representation existed. MNIC took steps to protect its interests in this matter. It filed responsive pleadings and obtained PIC's admission that the medical claims paid were reasonable. Then, MNIC did not participate in the trial. Although it is an important provision and the general rule remains that a subrogated party who opts to be represented by the joining party must file the written waiver, this technical requirement does not preclude MNIC's assertion that it formed a representation agreement with Horwitz.

## CONCLUSION

In sum, an attorney-client representation agreement existed between Horwitz and MNIC. We conclude that Horwitz disregarded his ethical duties when he negotiated the settlement agreement with PIC that was beneficial for one client but resulted in adverse consequences for his other client, MNIC. As a result of Horwitz' failure to adequately protect his client's' interests, we hold that the settlement agreement between PIC and the Gustafsons is void. Therefore, we reverse the trial court's judgment for costs against MNIC and its order denying MNIC's motion for reconsideration of the issue and remand for further proceedings not inconsistent with this decision.

*By the Court.*—Judgment and order reversed and cause remanded with directions.